The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. We'll hear argument first in No. 20-1335, Evolved Wireless, LLC v. HTC Corporation. Mr. Granitz. Thank you, Your Honor, and may it please the Court. Chris Granigan for Evolved Wireless. The District Court's judgment should be reversed for two reasons. First, the 373 patent, the only patent at issue on appeal, is not covered by the covenants not to sue. And second, even if the 373 patent is covered by the covenants not to sue, those covenants cease to have any effect once LG terminated the agreement in which those covenants appeared. I'll start with the covenants not to sue themselves. They apply to patents that are technically or commercially necessary to make, use, or sell subscriber units. Subscriber units is a defined term in the agreement and it means complete CDMA telephones and CDMA modem cards and any subsequent generation products. Now, as we've stated in our brief and as I'll get into, the only thing that a subscriber unit must have is CDMA. And importantly, that is true even if the subscriber unit is a multi-mode subscriber unit. I believe it is undisputed that a CDMA multi-mode device does not have to support LTE. It could, for example, be a CDMA slash GSM or a 3G, 2G device. And because the only thing that is necessary for a subscriber unit is CDMA, the only patents that are necessary to make, use, or sell subscriber units are patents that cover CDMA. Now, if penalties are trying to argue that because the accused devices here are subscriber units and they support LTE, the 373 patent, which is necessary to LTE, must be covered by the covenants. That is the wrong question to ask. It is true that the accused products are subscriber units and that's because they support CDMA. But that does not answer the question of what patents are covered by the covenants. To answer that question, we look at what patents are, in the language of the agreement, necessary to make, use, or sell subscriber units. And because the only thing that is necessary for subscriber units is CDMA, the only patents necessary to make, use, or sell subscriber units are patents covering CDMA technology. Now, let's look at why I say that the only thing necessary for subscriber units is that they support CDMA. And we'll start with the term complete CDMA telephone. That is a defined term and it means any complete CDMA, including multimode terminal, and I'm cutting off some of the irrelevant portions of the definition here, but a complete CDMA terminal that can initiate and or receive wireless communications. Wireless itself is also a defined term and it itself is limited to CDMA-based digital cellular systems, and again, I'm cutting off some irrelevant parts of the definition, and any other CDMA wireless applications. So a complete CDMA telephone is something that supports CDMA network technology. Appellees, again, hang their hat on the words, including multimode in the definition, and they contend that because the accused products are multimode CDMA LTE products, patents covering LTE technology are necessary to make them. Again, that is the wrong question. In the language of the agreement, the question is what is necessary to make, use, or sell complete CDMA telephones. The only thing a device must do to be a complete CDMA telephone is support CDMA technology. The three... Is that a hand? Yes, Your Honor. This is Judge Plager. I'm with you on all of that, but you forgot to add the language that comes after CDMA telephone or a CDMA modem card, the language that is, and any subsequent generation products. What is your understanding of what a subsequent generation product means? That's correct, Your Honor, and that is exactly where I was going next. Good. In our view, a subsequent generation product is simply a product that supports CDMA technology that is neither a complete CDMA telephone or a CDMA modem card. I believe the example we gave in our reply brief is something like a smart car or something else in the Internet of Things that are becoming more and more common. We think that is the correct understanding of subsequent generation products for a few reasons. First, the context in which it appears. As Your Honor noted, it appears in the phrase complete CDMA telephones, CDMA modem cards, and subsequent generation products. So the question we're asking is what is a subsequent generation product to a CDMA telephone and a CDMA modem card? Well, it's a product that is neither a CDMA telephone or a CDMA modem card. It is a new product that is not one of those. The way in which this term was… In this industry, isn't generation abbreviated to G and isn't it standard to refer to products as 3G or 4G products? I believe I agree with you that G and 3G means third generation network technology. 4G certainly means 4G network technology, but that is not the phrase that's used here. It is subsequent generation product. But I guess that's the heart of Judge Dyke's question is exactly the problem I have with your argument. When it says subsequent generation product, a product that is subsequent to the CDMA 3G technology, it seems to me would very clearly encompass LTE 4G technology. That's exactly what I think the subsequent generation is. So I'm confused. I feel like you want it to be accessory parts, but accessory parts aren't next-gen products. Next-gen products are the next generation of products, which is exactly what this is. Your Honor, I think it does make sense to refer to things as subsequent generation products when we think about how products with connectivity have evolved. For example, we had computers that were connected to the Internet first, and then we had phones, and now we have Internet of Things products, smart cars, things like that. I think it certainly makes sense to refer to those things as subsequent generation technology. But it also makes sense to refer to the LTE 4G products as the subsequent generation technology. Correct, Your Honor, and we don't dispute that a subsequent generation product could be something that does support LTE as long as it also supports CDMA. Our point is the only thing that is necessary is that the subsequent generation product supports CDMA. We think the way that that term was added to this agreement over time supports that reading. Recall that in the original 1993 agreement, the phrase was simply, I believe it was, CDMA telephone, a complete CDMA and or dual-mode CDMA telephone. That was broadened over time to the definition that we have today, which is complete CDMA telephone, CDMA modem card, or subsequent generation products. I think that shows that the intent of the party was not to expand the term to include new network technology, but to include new products that are not just telephones, but, for example, modem cards and other products. I think that... Yes, Your Honor. Mr. Granahan, this is Judge Flager again. Help me a little bit on this. I think I'm following you, but let me see if I can simplify the terminology just a little bit for my own use. Do I understand you to say the phrase subsequent generation, as you understand it, refers not to generations of technology, but to generations of products? That is to say, a subsequent generation product is a product that is neither a telephone nor a modem card. Whereas, if I understand your colleague on the other side, which I'm sure we'll hear from, I understand them to say subsequent generation means technology. Is that a fair statement? I believe that is correct, Your Honor. You certainly have accurately stated our position. I am not sure whether their position is that a subsequent generation product could be something that is LTE only or whether they believe that it must support CDMA. For example, on page 11 of their brief, they say that the license agreement covers devices that implement 3G and 4G technology. So, I think their position might be that a subsequent generation product must support CDMA, although I'm not 100% sure on that. Unless my colleagues have further questions on this point, I'd like to, before we run out of time, ask you about the termination issue. Yes, Your Honor. So, my understanding of opposing counsel's argument about this is that you're barred from raising the termination issue because you didn't make a motion, I guess, to supplement the summary judgment filings as required by the local rules. And could you tell me why you didn't make a motion, why you did it in the form that you did? Your Honor, to be candid, I don't know exactly why the decision was made to do it in the form that we did. I will say that I believe their position is not exactly that we should have made the motion. I believe it is that the district court appropriately excluded the evidence that we submitted of the termination because EVALT had not complied with the local rules. And we don't believe that... Not complied with the local rules by making a motion, right? Correct, Your Honor. But their position is that the district court made the decision to exclude the evidence. We don't believe that the district court did make the decision to exclude the evidence. We believe that the district court considered the evidence because it was discussed at the hearing. And so, I think that's why you've got to send it back. I'm sorry. I'm sorry. This is Judge Moore. I didn't mean to interrupt you. I don't think that we know what the district court did. It seems to me it's just a complete vacuum. So, why don't we send it back for them... Not send it back to necessarily find in your favor or send it back to necessarily find an opposing counsel favor, but just send it back so the district court can actually explain to us what his thinking was on this evidence. Your Honor, I certainly don't believe that you need to do that. I think the transcript shows that the district court considered it. And I think the district court erred by entering judgment in full. And I don't think appellees have contended otherwise. But if the court would rather remand so that the district court can make clear its reasoning, that is a remedy that we would be happy with. Excuse me. This is Judge Plager. When you say the district court considered it, am I mistaken? I didn't find anything in the district court's opinion, which I've read with some care, that even mentions the termination issue. Where does the district court explain its consideration of this issue? You are correct, Your Honor, that it does not appear in the district court's opinion. The district court discussed the termination at the hearing on the summary judgment issue, though. I would point you to pages 4726 to 4728 and page 4730 at the hearing. He asked several questions of evolved counsel at the termination, showing that he considered it. But there was still no indication of why he didn't rule on it, right? He did not say exactly why he didn't rule on it in the summary judgment order, Your Honor. He did indicate that the termination would not have made a difference because there must have been a new agreement between LG and Qualcomm after the termination. We certainly don't think that any new agreement would have made a difference because LG no longer owned the patent at that point and couldn't encumber it. But that was one of the reasons he gave for believing that it didn't make a difference. Unless my colleagues have further questions, I think we're out of time. We'll give you two minutes for rebuttal. Thank you, Your Honor. We'll hear from Ms. Maroulis. Good morning, and may it please the court. Victoria Maroulis for the Apple East. Your Honor, I would like to start with the question. Well, we're on the subject of the termination. Could you maybe address that? Yes, Your Honor. Isn't Judge Moore right that we have to send this back? Your Honor, I would disagree that it should be sent back because the district court judge was within his discretion to not consider the improperly and belatedly filed pleading. What happened here is that EVOL chose to violate local rules that are really important and vital for the district court's ability to control its docket. You mean the EVOL should have filed a motion? Is that the point? Yes, Your Honor. Yes, they should have sought leave to file anything after the summary judgment briefing closed. Instead, they chose to file a notice, which is not a proper pleading in Delaware, did not seek permission of the court, and did not cure it for the rest of the remaining period between when they filed it in February and nine months later when the decision of the court issued. Under the Green case, which is the third circuit precedent to which we'll look regarding the regional law and enforcement of the local rules, the court was within its discretion to not consider something that was not properly introduced into the summary judgment record. The fact that the court mentioned it or somebody else mentioned it in the hearing does not mean that this particular pleading was part of the record, was properly introduced in the record, and that the court had any obligation to consider it. But, counsel, I think there's three significant differences between the third circuit Green case and this one. And I'll go through all three with you, and then you can respond. Number one, the termination in this case occurred seven months after briefing ended. In Green, it occurred before briefing ended. Number two, EVOLVE diligently informed the court more than six months before the court issued a decision in this case. And number three, the court actually did allow argument on the termination point at the hearing itself, but then entirely failed to mention or address it in any dispositive way in the decision itself. Why don't those three factors take this case outside of what the third circuit did in Green and suggest instead that we have a scenario where the district court just, quite frankly, overlooked something, something that it did allow argument on, and send it back for the court. The court may well do exactly what you're suggesting, but we're an appellate court, and we review decisions, and I just don't see that we have an actual decision on this termination question. Yes, Your Honor, let me address all three. First of all, even though the termination or alleged termination occurred after the briefing and after the discovery, that did not absolve EVOLVE from seeking leave and seeking permission of the court to brief this issue. There was no lack of diligence here, right? They made the filing within a week of when they learned of it, right? Yes, Your Honor, it's not so much the lack of diligence on their part, but the prejudice to both the defendants or our police and the court, frankly, because the court is the one that suffered from the lack of proper procedure here. There was no request to submit briefing that would have put this alleged termination in proper context and no permission. Did the court suggest somewhere that I missed that it was prejudiced and that there was, therefore, refusing to consider this? No, Your Honor, it did not. Wait, wait. Counsel, so whether or not prejudice exists is a question of fact. Would you like us to decide in the first instance, as a matter of fact, that this prejudiced the district court? No, Your Honor. What we're suggesting is that the local rules, as interpreted by the Green Court and similar courts like Nall, for example, Nall v. Allentown, suggests that deference should be given to the local rules and to the district court's ability to manage its own docket. Counsel, Counsel, doesn't it, Counsel, doesn't that case say deference should be given to a court's decision about the local rules and deference should be given to a court's decision about how to manage its own docket? That's our problem here. Our problem here is I don't see any decision that was rendered by the court. Your Honor, in the Green case, the court did not say that they were excluding the third-party affidavit. The court simply did not consider it, did not rely, did not mention it. And on appeal, the Third Circuit said that the court had the discretion to not consider it and not refer to it in the opinion. That is why we're relying on the Green case because it does present a very similar situation to this case. There is at least one very significant difference, and that is in Green, there was complete silence from the district court, whereas here, the district court did acknowledge the filing and talked about the possibility of a new agreement. But you would have expected in that context, if it was dismissing it for a failure to file a motion, that it would have said something about it. Your Honor, the district court referred to this notice in the hearing, but it did not consider it in either the opinion or in any extended way during the hearing itself. There was a reference in passing during the hearing, but it was not consideration for the purposes of this case, nor was it part of the summary judgment record because it was filed belatedly and it was unaccompanied by any briefing that would allow the court to consider how does this alleged fact fit into the overall scheme of the case. What is the court to do with this belatedly filed notice? What is the court to do with this information? It should be noted that EVOLVE did not cure this and did not attempt to seek leave at any time. They did seek reconsideration of the court's original decision in February, but did not include in their request for reconsideration this particular aspect. They did not seek either clarification or reconsideration of the opinion once the summary judgment opinion issued. In other words, they did not take the steps to assist this court and the district courts in resolving this issue, and it is our position that the discretion standard requires that we allow the court to manage its own docket and to reject, either expressly or implicitly, filings that violate the court rules and the court schedule. If you'll allow me, I'd like to address the next generation, subsequent generation products before my time runs out. As Judge Moore and Judge Prager's questions suggest, it is absolutely undisputed in the realm of cellular technology that subsequent generation means the next standard. We move from 1G to 2G to 3G to 4G, eventually to 5G, but that is how that term is understood in this case and other cases. The district court understood it as such, the parties understood it as such, and EVOLVE throughout the space, before we got to the point of the summary judgment, also referred to generations in exactly the way that appellees are treating it here. I direct the court to Appendix 287 and 288, which is a portion of EVOLVE's complaints against one of the appellees, where EVOLVE clearly talks about generations as a leap between the different standards. Counsel, this is Judge Prager. Help me be clear on this. If we read the phrase subsequent generation products the way you want us to, that subsequent generation refers to a standard or technology, rather than the way your opponent wishes us to, then you win. Is that right? Yes, Your Honor. The subsequent generation product is a separate ground from the multi-mod CDMA phone. So either of those provisions of the definition of subscriber unit provide independent basis to affirm the district court. And if we read it the way they ask us to, that is that subsequent generation products refers to products and not to a standard or technology, then they win. Is that correct? Your Honor, let me clarify this. So what our position is is that the products that practice or support the subsequent generation standard are the subsequent generation products. So I think if I understand Your Honor's question correctly, either way whether you read it as subsequent generation product referring to the standard or product practicing that standard, the athletes win on this ground. Okay. So very briefly on the subsequent generation standard, and we didn't hear those arguments today, but EVOLVED has a number of different arguments in their briefing that relies on various canons of contractual interpretation, like a just and generous or not to throw associates, but these canons are not applicable because the terms here are not ambiguous. And I didn't hear EVOLVED counsel contest that, that there's ambiguity in the plain language of the agreement. And so those particular canons and those particular doctrines do not apply here. Separately from the subsequent generation product, which is one of the grounds that athletes are relying on, the court also correctly held below that the 373 patent is technical and commercially necessary for making, using, or selling subscriber units because they're multimode CDMA phones. And the fact that the CDMA phone definition was amended and expanded over time to include multimode devices, and because all the devices in this case. I'm sorry, Your Honor, was there a question? No, I don't think there was a question. Apologies. Because the agreement was amended to add the multimode portion and all the devices in this case support both 3G and 4G standards, this is another way why this agreement supports the finding of exhaustion and license. In particular, counsel argued that the only multimode CDMA products are ones that include 3G and 2G. That is not correct. So long as the devices support 3G, if they also support 4G or 5G, for example, the 4G technology is technical and commercially necessary for making, using, and selling the subscriber units. In other words, there are two separate ways and two independent provisions to read this agreement in a way that supports the court's finding of exhaustion and license here. Okay, anything else? Your Honor, I believe I covered my argument. Does the court have any questions for either of the parts? If I have a few minutes left, I just want to reiterate the importance of the local rules in the district court's management of the case and the fact that if we were to send the case back and encourage behavior like evolves where they did not seek leave and did not give the court an opportunity to consider something and not include it in their docket, that would encourage similar behavior and would take away from the court's ability to equitably and efficiently administer its docket. Therefore, this is not a mere technicality. This is an important issue, and it's an issue that the Third Circuit addressed in Green and in all cases, and in both of them. It was clear to the court that the delatedly filed evidence, despite whatever importance it might have, that was filed without leave and without explanation was not something that the courts could and should consider. Okay, thank you, Mrs. Marouas. Thank you, Your Honor. Mr. Granaghan, we have two minutes. Thank you, Your Honor, and very briefly, I just want to address the Green case very quickly. We think it is distinguishable for all the reasons that Judge Moore gave, and I also want to emphasize that not only was the district court in Green silent about the affidavit at issue, but there were reasons to believe in that case that the district court had affirmatively excluded that affidavit. For example, the district court stated that all of the properly produced evidence in that case was hearsay. The Third Circuit determined that that was a conclusion that would not apply to the affidavit at issue, and so the district court in Green must have decided to exclude the affidavit from evidence. That did not happen here. The record shows that the district court actually considered the evidence of the termination, yet decided that it did not matter. That itself distinguishes Green. Unless the court has any further questions, I'll cede the remainder of my time, and we ask that the judgment of the district court be reversed in full, and at the very least, that it be reversed at least as to infringement occurring after termination of the agreement, which is December 31, 2018. Counsel, before you go away, just clarify something for me. Perhaps it's more curiosity than necessarily determinative, but with regard to this termination, do we know why there was an attempt to terminate or there was a termination of this agreement, and if anything, was there anything that followed it? I do not know, Your Honor, why the agreement was terminated. There was a termination provision that allowed either party to terminate the agreement as of December 31, 2018, and LG chose to exercise that termination option. I don't know why they made that decision. As to whether there was an agreement afterward, I am not sure. The evidence of record indicates that the parties were negotiating, but I'm not sure whether they actually came to an agreement. All right. Thank you, Counsel. Thank you, Your Honor. All right. Thank both counsel. The case is submitted.